# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| SUMNER PLAINS 84, LLC, a Washington Limited Liability Company,<br><br>Appellant,<br><br>v.<br><br>JOHN ANTHONY WAKEFIELD and MARIE, WAVELET WAKEFIELD, husband and wife, and the marital community comprised thereof, et al.,<br><br>Respondents. | No.  59069-7-II<br><br><br><br>UNPUBLISHED OPINION |

PRICE, J. — For a second time, Sumner Plains 84 LLC and John Wakefield find themselves before this court in their dispute over a settlement agreement.  In 2022, we interpreted the settlement agreement between these two parties.  Following a remand and resulting bench trial, the trial court attempted to apply this interpretation to the facts and found that Wakefield did not breach the agreement.

In the current appeal, Sumner argues that the trial court failed to properly apply our interpretation and that many of the trial court's factual findings were not supported by substantial evidence.  According to Sumner, if our interpretation of the settlement agreement is properly applied to the evidence, then, as a matter of law, Wakefield breached the agreement.  Wakefield responds that the trial court's factual findings are supported by the evidence and that those findings amply support the conclusions of law.

We disagree with both parties. Accordingly, we affirm in part, reverse in part, and decline to award attorney fees on appeal.

FACTS

I. BACKGROUND

Between 2013 and 2018, Wakefield was a commercial tenant of three warehouses owned by Sumner. At some point during his tenancy, Wakefield made several alterations. The alterations included an office addition and the removal of a section of a demising wall[1] in order to create a pass-through between the warehouses. The alterations also included some electrical work for lights and outlets for the office, and the rerouting of some plumbing for the pass-through.

When Wakefield's lease ended, he left the office addition as it was, but he restored the removed section of the demising wall (that was used for the pass-through) by reframing it and covering it with drywall.

II. INITIAL LITIGATION AND SETTLEMENT AGREEMENT

Sumner was not happy with the way the premises were left. Sumner sued Wakefield, alleging that Wakefield, among other things, "made a multitude of illegal and unauthorized alterations to the premises that violate[d] applicable building codes." Ex. 101 at 4.

In May 2019, Wakefield and Sumner resolved this initial lawsuit by entering into a settlement agreement. As part of the settlement agreement, Wakefield was required both to repair his alterations and to obtain approval for them by the City of Sumner (the City) within one year of

---

[1] A "demising wall" is "[a] separation between two tenants, or between a tenant and a hallway or corridor. The demising wall creates a boundary between two apartments for example." JEFF HADEN, THE COMPLETE DICTIONARY OF REAL ESTATE TERMS EXPLAINED SIMPLY: WHAT SMART INVESTORS NEED TO KNOW 73 (Marie Lujanac ed., 2006).

the settlement agreement (May 23, 2020). The settlement agreement provided that "[Wakefield] will obtain inspection and approval from the City of Sumner" of the restored demising wall and all of his "tenant improvements." Ex. 2. The settlement agreement also required Wakefield to "coordinate the necessary work and pay for all labor and materials." Ex. 2.

Wakefield began by contacting the City in order to learn what repairs would be necessary. An inspector from the City, Richard Kelley, conducted a walk-through with Wakefield and identified areas of concern.

As Wakefield began the repairs identified by Kelley, Wakefield applied for, and later received, a "Commercial Tenant Improvement" permit from the City in February 2020. Ex. 118. On the permit application, Wakefield signed the form under a section labeled "Signature of Owner / Authorized Agent." Ex. 114. The permit allowed Wakefield to begin his repairs, but the City would conduct a final inspection before the permit would receive final approval.

In the meantime, Kelley conducted a final inspection of the premises. On May 19, 2020, four days before the expiration of the one-year deadline, Kelley signed the permit's inspection card, giving Wakefield's permit final approval. The inspection card specifically referenced Kelley's sign off on "framing," "insulation," and "final building." Ex. 119. The next day, Wakefield's counsel sent Sumner a letter letting them know that Wakefield had fulfilled his obligations under the settlement agreement prior to the one-year deadline and attached copies of the approved permit.

III. *SUMNER PLAINS I*

Sumner was still not happy. Less than one month after Wakefield's notice that he had secured an approved permit, Sumner filed a second lawsuit for, among other claims, breach of the

3

settlement agreement. Sumner alleged that Wakefield had breached the agreement because he had failed to "cause all of the tenant alterations he made to be inspected and approved by the City of Sumner" and because he had failed to "perform additional work required for approval" by the settlement agreement's deadline. Clerk's Papers (CP) at 53. Both parties moved for summary judgment, which the trial court granted in Wakefield's favor. *Sumner Plains 84, LLC v. Wakefield*, No. 55406-2, slip op. at 2 (Wash. Ct. of App. Aug. 2, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2055406-2-II%20Unpublished%20Opinion.pdf (*Sumner Plains I*).

Sumner appealed to this court. In our resulting opinion, *Sumner Plains I*, we addressed whether genuine issues of material fact existed as to Wakefield's compliance with his duties under the terms of the settlement agreement and his compliance with his implied duty of good faith and fair dealing. *Sumner Plains I*, slip op. at 4, 7. We determined that Wakefield had certain obligations under the agreement's "clear" terms. *Id.* at 10-12 (relying on the settlement agreement's "clear" language and terms rather than extrinsic evidence in order to determine Wakefield's obligations). We agreed with Sumner that the agreement required Wakefield to obtain "a city inspection and approval of *all* of [his] alterations, including the plumbing, and electrical work . . . ." *Id.* at 10. And, "the [C]ity [was required to] approve *those alterations*, not simply approve one aspect of the premise." *Id.* at 10 n.4 (emphasis added). Further, Wakefield had to make "any repairs [and] obtain[] the approval in good faith." *Id.* at 12. Thus, Wakefield had the duty "to ensure" that the City inspected and approved his alterations, "not simply that the [C]ity conduct *an* inspection." *Id.* at 13.

However, we also held that "Wakefield was only obligated to make the repairs *necessary* for the [C]ity's approval and he was not obligated to ensure the repairs were up to code." *Id.* at 8 (emphasis added). Declining to read beyond the settlement agreement's plain language, we explained,

> There are no terms in the agreement that required the repairs to be up to code, and there is no term that could be reasonably interpreted as requiring Wakefield to ensure the repairs were up to code. Rather, the agreement required Wakefield obtain the [C]ity's approval of the alterations. Presumably, the [C]ity would not approve an alteration if it was not up to code, thereby requiring the alterations be up to code. But there is simply no term in the contract that provides that Wakefield was required to know every building code and recognize when an alteration was not up to code, even if a city inspector were to miss that an alteration was not up to code. . . .

*Id.* at 11-12.

But we observed that Wakefield's obligations under the implied duty of good faith and fair dealing required him to not have misled the City into making a "smaller inspection" than his alterations would otherwise require. If that were the case,

> then Wakefield prevented Sumner from realizing the full performance under the agreement. This is not to say that Wakefield was responsible for any errors the [C]ity might have committed; rather, Wakefield was responsible if he caused the [C]ity to make those errors.

*Id.* at 15 (citation omitted).

Following this interpretation, we determined that genuine issues of material fact still remained as to whether Wakefield had fulfilled his obligations. *Id.* at 12-15. For example, while it was clear from the record that Wakefield received an inspection and approval from the City, the extent of the inspection was unclear as was whether Wakefield had actually told the City about his electrical and plumbing alterations. *Id.* at 12. Additionally, while it was clear that Wakefield had "misrepresented that he was the owner or registered agent of the owner," it was unclear if this

5

misrepresentation was intentional or if this misrepresentation caused the City to conduct a smaller inspection. *Id.* at 14-15.

To resolve these genuine issues of material fact, we remanded to the trial court for further proceedings.

## IV. BENCH TRIAL

Following remand, the case proceeded to a bench trial in October 2023. As required by *Sumner Plains I*, the trial court was charged with resolving (1) whether Wakefield had breached the terms of the settlement agreement by failing to get all of his alterations inspected and approved by the City and (2) whether Wakefield had breached the implied duty of good faith and fair dealing. *Id.* at 13.

## A. WAKEFIELD'S TESTIMONY

Wakefield began his testimony by explaining his understanding of the negotiations behind the settlement agreement. He explained that the parties had agreed to have the City be the entity to inspect and approve his alterations because the City was a neutral third party and because the City "[was] the entity that would ultimately approve the work." 4 Verbatim Rep. of Proc. (VRP) at 411.

Wakefield also testified that it had been his impression that Sumner did not want to be involved during the inspection and approval process; he did not reach out to Sumner and Sumner did not reach out to him. When Wakefield did initially reach out to Sumner to access the warehouses for initial inspection, Sumner told him to communicate with the property management company and contact the warehouses' current tenants.

6

Wakefield testified that after the settlement agreement, he had contacted the City for an initial inspection to ascertain what would be necessary to submit with his permit application and what repairs he would need to make to get his permit approved by the City.

This initial inspection was conducted by City Building Official Rick Kelley in August 2019. Wakefield testified that he had met with Kelley and "explained to him that [he and his employees] had done the entire build out [them]selves" and that "everything [Kelley] s[aw] here" was part of the build out. 4 VRP at 412, 447. He had explained to Kelley that he and his employees had personally built the enclosed office space and had restored the demising wall that had previously included a "pass[-]through" between the warehouses. 4 VRP at 413.

Wakefield testified that during the walkthrough, he had showed Kelley the "inside [of] the office space as well as inside of the warehouse side of the office." 4 VRP at 413. Wakefield said that at one point, he had given Kelley a ladder so that Kelley could "crawl[] up on top of the office and review[] the framing and how it was built." 4 VRP at 413. From the top of the office, Kelley could examine "how the joists were constructed, how the electrical wires were [run], the thickness of the sheetrock, and everything like that." 4 VRP at 413.

Although Wakefield remembered showing Kelley the lighting and switches that he had installed and remembered telling Kelley broadly that he had done "everything" in the added office space, Wakefield could not remember whether he had specifically told Kelley that he been the one to personally install all of the electrical work.

> [Sumner:] Well, he saw lights, but you didn't tell him that you had installed the electrical work, did you?
>
> [Wakefield:] I did. I told him everything. I don't know if I said specifically, "I installed the electrical." I told him, "I did everything that you see here in this build out," and I directed him to the lighting and the switches and everything.

7

[Sumner:] You don't specifically remember[] advising him that you had personally performed the electrical work, correct?

[Wakefield:] I don't know the words that I said, but I know I gave him clear direction as to letting him know that I built out everything.

[Sumner:] Question: "Did you specifically inform him that you had personally performed the electrical work?"

. . . .

[Wakefield:] Did I inform him personally? I believe I told him I did everything. "Here is the build out. I did everything." I don't remember telling him, "I put that switch in," or, "I put those wires in."

4 VRP at 447-48.

Wakefield also testified that he had shown Kelley the restored section of the demising wall that had previously served as a pass-through between the warehouses. Wakefield explained that he had told Kelley that he had used wood studs for the restoration and then covered it in sheetrock. According to Wakefield, Kelley did not ask him to open up the wall to examine the framing inside, even though the wood studs were not visible under the sheetrock.

Wakefield admitted that he did not tell Kelley about any "plumbing changes." 4 VRP at 448. He said, "That was nine years ago" and that he "[didn't] even remember it until it was brought up in this case." 4 VRP at 448.

However, Wakefield denied that he intentionally hid anything from Kelley during the inspection. He said,

To be honest, I have never been sued before. I wanted to take care of the settlement agreement in its full capacity, and so I was very transparent about everything I did, and I wanted to complete everything that I did and be done . . . .

4 VRP at 414. Wakefield explained that after he had shown Kelley the space and his alterations, he had been relying on Kelley to explain to him what needed to be approved.

Following this initial inspection, Kelley gave him a list of three items that needed to be completed. To Wakefield's understanding, these items were (1) getting a diagram of the office's ceiling plan that was approved by an engineer that would be submitted with his permit application, (2) installing fire sprinkler drops, and (3) adding insulation to the office's ceiling.

Wakefield worked at completing the three items throughout the end of 2019 and into the beginning of 2020. He began by obtaining the engineer-approved ceiling diagram so that he could submit his permit application before addressing Kelley's other requirements.

Wakefield found an engineer and forwarded Kelley's instruction, " 'Ceiling framing needs to be reviewed and approved by an engineer.' " 4 VRP at 414 (quoting Ex. 109). Upon receiving the plans back from the engineer, Wakefield saw that the plans specified the use of steel studs for the framing to restore the demising wall where there had previously been a pass-through. But Wakefield testified that he had kept the wood studs as they were because Kelley understood that wood studs were used and had not instructed him that metal studs were necessary.

Wakefield submitted the engineer-approved plans with his permit application in November 2019. Wakefield based the information on his permit application on the list of repairs Kelley told him to make and listed the project description as "add office enclosure" and "[demising] wall pass[-]through." Ex 114. Wakefield explained that because Kelley had not told him to make any changes to the lights, wiring, or electrical outlets in the office addition, Wakefield did not add information about his electrical alterations in his permit application.

9

Wakefield testified that in early February 2020, he had received a letter from Allison Judge, a permit specialist with the City. The letter included its own list of additional tasks for permit approval, including using metal studs for the framing to restore the demising wall. Wakefield said that he had forwarded this letter to Kelley and asked whether he needed to address the additional tasks contained in the letter or if the original three items that Kelley had given him were sufficient. Wakefield confirmed that Kelley had emailed him a response that said that Allison Judge's letter included " 'comments of a plans examiner that was filling in for [him] while he was off' " and that he would look at the plans next week with Wakefield to " 'see what needs to be fixed.' " 4 VRP at 456 (quoting Ex. 116). Wakefield said nothing more about any such meeting with Kelley or, for that matter, any further contact with Allison Judge.

In late February 2020, the City issued Wakefield a permit that allowed him to begin repairs consistent with his permit application.[2]

Wakefield was asked why he had not followed the instructions from Allison Judge's letter or from the engineer-approved plans to use metal studs; he responded that he had not changed the studs from wood to metal because Kelley never told him to. Wakefield explained that he had both disclosed to Kelley during the initial inspection that he had used wood studs and forwarded to Kelley Allison Judge's letter, but that Kelley had never told him that the studs needed to be replaced. He had "relied entirely" on Kelley's instruction. 4 VRP at 470.

> [Sumner's counsel:] Sir, you also testified, however, that after [the initial inspection], you understood that additional things might be required from the building department, correct?

---

[2] Once Wakefield made the repairs required by the City, he would receive final approval.

[Wakefield:]  I was working with Rick Kelley.  I would have done whatever Rick Kelley told me to do beyond those three items.

. . . .

[I]f you want to go back to A[l]lison Judge's form that she sent us, I specifically gave that to Rick Kelley and said, "Hey, what's this about?"  He said, "Let me look at it.  I'm on vacation."

If he came back and said, "You need to do all of this," I would have done all of it, but he didn't.

4 VRP at 470-71.

Wakefield testified that in May 2020, nine months after the initial inspection, Kelley had conducted a final inspection on behalf of the City.  Because it was the beginning of the COVID-19 pandemic, Kelley conducted the final inspection through a video call on Wakefield's phone.  Wakefield followed Kelley's direction as to where to move the camera.  Wakefield showed Kelley the inside of the office and the outside of the warehouse, and he climbed up a ladder to show Kelley the ceiling of the office.  After the final inspection, Kelley signed an inspection card documenting that the permit for the office space addition and the restored demising wall was approved.  Wakefield notified Sumner of the permit approval the next day.

After Sumner reviewed the premises, Wakefield understood that Sumner was still dissatisfied.  Wakefield testified that he immediately tried to fix the problems identified by Sumner and was willing to complete additional work.  He explained:

I wanted this just to be done, so if at the end of the day [Sumner] feels—if there was a couple of extra items that maybe [they] wanted done that I didn't do, I was willing just to have them done.  I would have done whatever at that time.

4 VRP at 423.

Wakefield reached out to a City permit technician (not Kelley) to ask if "there [was] anything remaining, and what else [he] need[ed] to do to comply with the build out being approved by the City." 4 VRP at 422. The City denied that any further work was required, stating " 'Final building inspections have passed, so nothing further is required for you to close out this permit.' " 4 VRP at 422 (quoting Ex. 120).

Wakefield then testified that because he had "wanted to do everything [he] could," he had applied for a certificate of occupancy from the City in September 2020. 4 VRP at 422.

> It was [Sumner] who wanted me to get approval from the City of Sumner, and if that took getting an occupancy permit, then that's what I was going to do.

4 VRP at 481.

Finally, Wakefield testified that because Sumner had complained that the electrical work had not been approved, he had offered to coordinate a separate inspection of the electrical work. He said Sumner had denied his offer.

B.  KELLEY'S TESTIMONY

Kelley's testimony largely mirrored Wakefield's about the initial and final inspections that occurred in August 2019 and May 2020, as well as the items Wakefield was required to complete for the final approval.

1. Inspections

Kelley testified that during the initial inspection in 2019, Wakefield had told him that he personally had done all of the work in the office and had personally restored the part of the demising wall that had previously been removed to create a pass-through between the warehouses. Kelley testified that Wakefield had told him that wood studs were used for the restored demising

wall. Kelley conceded that he did not ask Wakefield to remove the drywall to inspect the framing, but Kelley believed that if he had asked Wakefield to do this, Wakefield would have complied.

Kelley could not recall if Wakefield had told him that Wakefield had altered the plumbing, but he recalled that he did not inspect it. When shown a photo of the plumbing alterations, Kelley testified that if he had seen what was depicted in the photo during his initial inspection, he would have ordered Wakefield to correct how the pipe was rerouted.

Kelley recalled that when Wakefield had showed him the office space, it included electrical outlets in the walls and canned lights in the ceiling. Kelley was "not sure" what Wakefield had told him about these electrical installations, like whether the work had been done personally by Wakefield himself, who was unlicensed, or whether the work was unpermitted. 4 VRP (Oct. 4, 2023) at 372. But Kelley confirmed that if he had known it was unpermitted, he would have required Wakefield to get approval.

> [Sumner's counsel:] [I]f Mr. Wakefield told you that he had installed the electrical work without any formal training, without a license, without any kind of electrical permit and without an electrical inspection, you would have told him to go to the Department of Labor & Industries[3] for approval, right?
>
> [Kelley:] Yes.

4 VRP at 372.

Kelley testified that he and Wakefield had received the same letter from Allison Judge in February 2020, and he also confirmed that Wakefield had forwarded his copy of the letter to Kelley. Kelley acknowledged that the letter had included additional requirements for compliance

---

[3] Department of Labor and Industries (L & I) is the department that issues electrical permits for the City.

with the building codes, such as using metal studs in the restoration of the demising wall. However, Kelley appeared to suggest that Wakefield did not have to follow all of the requirements of Allison Judge's letter—he explained that "as the building official, [he had] the capacity to accept alterations" to the building plans. 4 VRP at 383-84. Kelley emphasized that as the inspector, he was the one who was familiar with the project and in his opinion, given the scope of Wakefield's alterations, "wood studs . . . sufficed just as well [as metal]." 4 VRP at 483.

Kelley testified that during the final May 2020 inspection that was conducted over video call, he had directed Wakefield where to move the camera and what needed to be inspected. For the restored portion of the demising wall, Kelley could not see the framing underneath the drywall or see if the wall was attached to the floor or the rest of the structure. However, Kelley testified that he had known that the studs behind the drywall were wood.

Kelley testified that based on this final inspection, he had approved Wakefield's permit application. Kelley affirmed that "[a]s the building official for the City of Sumner, [he] ultimately h[ad] final authority to approve Mr. Wakefield's permit and tenant improvements." 4 VRP at 400.

Kelley testified that about one month later, in June 2020, Wakefield had contacted him to ask about the process of obtaining an electrical permit; Kelley told Wakefield that he would have to contact L & I. Kelley also testified that the fact that Wakefield had not obtained an electrical permit was not grounds for revocation of "[Kelley's approval of the tenant improvements" or Wakefield's certificate of occupancy. 4 VRP at 367.

2. Permit Application—Wakefield signing as "authorized agent"

Kelley also testified about the permit application that Wakefield submitted to the City that included Wakefield's signature as Sumner's "owner or the owner's agent." 4 VRP at 374. Kelley

14

said that at the time that he was inspecting Sumner's property, he had not known that Wakefield was not Sumner's authorized agent. If he had known this, Kelley confirmed that he "wouldn't [have been] able to process" the permit. 4 VRP at 375. However, Kelley also said that the signature did not make a difference as to his approval of the alterations—his inspection was based on whether he thought the alterations complied with the building's plans and the building code.

## V. THE TRIAL COURT'S APPLICATION OF *SUMNER PLAINS I*

Following the testimony of Wakefield, Kelley, and Sumner's representatives, the trial court issued an oral ruling in favor of Wakefield. Later, the trial court reduced its oral ruling to written findings and conclusions. It began by declaring that "[*Sumner Plains I*] is now a final determination on appeal and presents the binding law of the case." CP at 853. The written findings and conclusions made multiple additional references to *Sumner Plains I*, either by directly quoting our opinion or mirroring its language.

## VI. THE TRIAL COURT'S FINDINGS OF FACT

The trial court's lengthy written findings of fact included a general overview of the dispute and the overall determination that Wakefield fully complied with the settlement agreement. Finding of fact 14 stated,

> The primary dispute in this case concerns whether Wakefield obtained "inspection and approval" of his tenant improvements by the City of Sumner as required by the settlement agreement. The evidence produced at trial showed that Wakefield conducted an inspection with the building official to identify issues and later obtained a final inspection by [City of] Sumner Building Official Rick Kelley, Wakefield corrected each and every item that Kelley identified as required and that Wakefield obtained a building permit for the tenant improvements. The evidence also showed that Wakefield was open and forthright with Kelley, did not conceal any facts or details of his work from Kelley, and sought to carry out his settlement obligations in good faith throughout the term of the contract. . . .

CP at 846-47.

In addition to this general overview, the trial court's findings of fact also addressed the specifics of Wakefield's interactions with the City and his repairs, which can be categorized into the following five groups: (1) Wakefield's interactions with Kelley, (2) Wakefield's alterations to restore the part of the demising wall that had previously served as a pass-through, (3) Wakefield's alterations to the plumbing, (4) Wakefield's alterations to the electrical and wiring, and (5) Wakefield's compliance with the implied duty of good faith and fair dealing.

A. GENERAL FINDINGS ABOUT WAKEFIELD'S INTERACTIONS WITH KELLEY AND SUMNER

Addressing the interactions between Wakefield and Kelley, the trial court found that after the initial inspection, Kelley had sent Wakefield a list of tasks he would need to complete in order to get his permit approved by the City. These tasks included obtaining fire sprinklers in the new area, adding insulation to the ceiling, and having the ceiling framing of the office area reviewed by an engineer. Wakefield later "received and read a letter from [the City's Allison Judge] which specified potential additional work beyond the three items listed by Kelley at the initial walk-through," but the trial court found that "Wakefield [had been] entitled to rely and did rely on Kelley's representations as [City of] Sumner Building Official that he did not need to perform the items listed in [Allison] Judge's letter." CP at 849 (Findings of Fact (FF) 25, 27).

The trial court found that Sumner had not reached out to Wakefield to "follow up," ask about his progress, or "request any kind of periodic status updates" between the time the settlement agreement had been signed and the time Wakefield had completed his settlement agreement obligations. CP at 847 (FF 16).

16

The trial court found that during the final inspection, Wakefield "[had] not tr[ied] to conceal any facts or improvements from Kelley"—"there was nothing [Kelley had] asked Wakefield to do or reveal that [had] not [been] done or revealed." CP at 851-52 (FF 41).

Kelley reviewed all of the corrective items that he had assigned to Wakefield after his initial inspection as well as "all the tenant improvements that were visible." CP at 851 (FF 39). Kelley then signed off on inspections of the " 'framing,' 'insulation,' and 'final building,' " this "finaliz[ed] the validity of the permit for Wakefield's tenant improvements." CP at 852 (quoting Ex. 119) (FF 42). After passing Kelley's final inspection, the trial court found that "Wakefield had fully completed all his obligations under the settlement agreement." CP at 852 (FF 43).

B. FRAMING ALTERATIONS FOR RESTORATION OF THE DEMISING WALL

Finding 19 stated that during the initial inspection, Kelley was "aware" that Wakefield used wood studs when he restored the demising wall that had previously included a pass-through:

> City of Sumner Building Official Kelley conducted an initial on-site inspection of Wakefield's tenant improvements in August 2019. At the initial on-site inspection, Wakefield told Kelley about his improvements, including the fact that in constructing the pass-through repair, Wakefield had used wood rather than metal studs. Wakefield provided Kelley with a ladder so he could inspect the office ceiling framing and insulation from above. Wakefield did not hide or conceal any of his improvements, nor did he otherwise try to mislead Kelley during the inspection. Wakefield afforded Kelley a full opportunity to inspect any and all portions of the tenant improvements. Kelley testified that he was aware that Wakefield had used wood studs in filling in the demising wall.

CP at 848 (FF 19).

Finding 40 similarly stated that Kelley had also been aware that Wakefield used wooden framing when he did the final inspection:

> At the final inspection, Kelley was aware that wood studs were used in the filled-in demising wall and could see the taping and nail marks. The uncontradicted

evidence shows that Kelley knew of the presence of wood studs in the demising wall.

CP at 851 (FF 40).

The trial court also found that Wakefield had been "honest" with Kelley during both the initial and final inspections about his alterations for the warehouse's framing and that if, at any point, Kelley had asked Wakefield to remove the drywall or take any other actions to aid in a more detailed inspection that Wakefield would have done so. CP at 851 (FF 41).

## C. PLUMBING ALTERATIONS

Finding 23 stated that "[n]either Kelley nor Wakefield was aware that Wakefield or an employee of [Wakefield] had rerouted a water pipe around the demising wall opening." CP at 848 (FF 23).

## D. ELECTRICAL ALTERATIONS

Finding 20 stated that during Kelley's initial on-site inspection, Kelley knew that Wakefield's alterations to the property included electrical alterations.

> It was clear to Kelley that Wakefield's tenant improvements included electrical installations by the apparent outlets and can lights in the office. Kelley testified that he was aware that Wakefield's tenant improvements had included electrical work.

CP at 848 (FF 20).

The trial court also found that if Kelley had told Wakefield to obtain an independent inspection of his electrical alterations, Wakefield would have done so.

## E. GOOD FAITH AND FAIR DEALING

The trial court clearly determined that Wakefield had not acted in bad faith. It made multiple findings that throughout the permitting process, and during both the initial and final

inspections, Wakefield had been "open," "forthright," and "honest," and that Wakefield had not "conceal[ed]" or "hid[d]e[n]," any facts or details related to his alterations or work or "otherwise tr[ied] to mislead Kelley." CP at 847 (FF 14), 848 (FF 19), 851-52 (FF 41), 853 (FF 48).

Finding 45 specifically stated that Wakefield's attempts to obtain a certificate of occupancy even after litigation had already commenced further demonstrated "his efforts to comply in good faith with the settlement agreement." CP at 852 (FF 45).

In contrast, the trial court also found that Sumner was "not [] credible" when it accused Wakefield of "conceal[ing] his actions from Sumner[] and intentionally exclude[ing] Sumner[] from the permitting process" and that this theory was unsupported by the evidence.[4] CP at 853 (FF 47-48). The trial court found that "Wakefield's testimony about his compliance efforts was credible" and that he had "sought to carry out his settlement obligations in good faith throughout the term of the contract." CP at 853 (FF 48); CP 847 (FF 14).

The trial court was unpersuaded specifically by Sumner's argument that when Wakefield had signed the permit application as Sumner's "authorized agent," that Wakefield had done so as a deliberate act in bad faith in order to exclude Sumner from the permitting process. The trial court found that Wakefield's "misrepresentation" to the City had simply been a mistake on Wakefield's

---

[4] In its oral ruling, the trial court further explained:

> "[C]onceal" in this context implies an intent to willfully avoid a disclosure. Mr. Kelley and Mr. Wakefield both testified that Mr. Wakefield was fully compliant with the inspection, would have removed drywall, had that been requested, would have, you know, got—he got a ladder so that Mr. Kelley could do the inspection from ceiling to floor. There was nothing about the inspection process, either the first time or the final inspection, that indicates some willful intent not to disclose a condition.

1 VRP (Oct. 5, 2023) at 14.

part. CP at 850 (FF 29). And further, the trial court found that because Wakefield's signature did not change the scope of Kelley's inspection, what was required for approval, or "any relevant part of the tenant improvement permitting process," that Wakefield's "misrepresentation" was immaterial. CP at 850 (FF 30).

## VII. THE TRIAL COURT'S LEGAL CONCLUSIONS

From these factual findings, the trial court then applied its understanding of *Sumner Plains I*'s holding for its conclusions of law. The trial court concluded that "Wakefield [was] not responsible for any oversights by the City of Sumner Building Official in inspecting or granting approval of the work." CP at 855 (Conclusion of Law (CL) 15). Thus, with respect to the electrical alterations, the trial court concluded that Wakefield had not been required to obtain any additional approvals or permits because the City had not informed him that doing so was required.

> The City of Sumner was aware of Wakefield's electrical wiring work which was included in the build-out area. The City did not inform Wakefield that an additional electrical or plumbing inspection was required to grant approval. Wakefield fulfilled his settlement agreement obligations with respect to any electrical work on the premises, since the City of Sumner approved the build-out knowing that some electrical wiring work had been done. Wakefield complied with his settlement agreement obligation to obtain inspection and approval from the City of Sumner.

CP at 856 (CL 17). Beyond this brief reference to Wakefield's plumbing alterations in this conclusion, the trial court made no other conclusion of law regarding Wakefield's compliance with the settlement agreement as it related to his plumbing alterations.

The trial court concluded that Wakefield had been required to do only the three tasks that Kelley told him to complete—obtaining a diagram of the office's ceiling plan that was approved

20

by an engineer, installing fire sprinkler drops, and adding insulation to the office's ceiling. Conclusion 19 stated,

> The City of Sumner did not require Wakefield to perform any of the actions listed in [Allison Judge's letter], nor any other actions beyond the three items listed by Kelley after his initial inspection. Thus, those items were what Wakefield needed to perform in order to successfully perform the settlement agreement.

CP at 856.

Deciding that Wakefield did not breach the settlement agreement, the trial court awarded Wakefield costs and attorney fees as the prevailing party.

Sumner appeals.

ANALYSIS

Sumner's main argument on appeal is that the trial court failed to follow "the law of the case" (here, our directives in *Sumner Plains I*) when it concluded that Wakefield had complied with the terms of the settlement agreement. Sumner contends that if the holding of *Sumner Plains I* is applied to the undisputed facts, Wakefield clearly breached his duty under the terms of the settlement agreement to "ensure" that the City inspected and approved all of his alterations—the framing of the restored section of the demising wall, the plumbing, and the electrical alterations. Additionally, Sumner argues that the facts establish that Wakefield breached his duty of good faith and fair dealing. In support of these arguments, Sumner alleges that several of the trial court's findings of fact were not supported by substantial evidence.

We begin by discussing Sumner's main argument about the law of the case. And then we move to addressing Sumner's arguments about the trial court's findings and conclusions about the specific alterations.

I. STANDARD OF REVIEW

After a bench trial, we review whether substantial evidence supports a trial court's factual findings. *Alexandria Real Estate Equities, Inc. v. Univ. of Washington*, 28 Wn. App. 2d 944, 961, 539 P.3d 54 (2023), *review denied*, 2 Wn.3d 1031(2024). The party challenging a finding bears the burden of showing that a finding is unsupported. *Nguyen v. City of Seattle*, 179 Wn. App. 155, 163, 317 P.3d 518 (2014). Any unchallenged findings of fact are verities on appeal. *Alexandria*, 28 Wn. App. 2d at 961.

As the reviewing court, it is not our role to supplant the trial court's judgment with our own, even if we might have resolved factual disputes differently. *Chiu v. Hoskins*, 27 Wn. App. 2d 887, 892-93, 534 P.3d 412 (2023), *review denied*, 2 Wn.3d 1018 (2024). Thus, we look at the record in the light most favorable to the prevailing party. *Nguyen*, 179 Wn. App. at 163. So long as "there is sufficient evidence 'to persuade a rational, fair-minded person of the truth of the finding' " we will not disturb the trial court's findings. *Chiu*, 27 Wn. App. 2d at 892 (internal quotation marks omitted) (quoting *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688 (2007)). Even if the trial court's factual findings are erroneous or unsupported, "immaterial findings that do not affect its conclusions of law are not prejudicial and do not warrant reversal." *State v. Coleman*, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018), *review denied*, 193 Wn.2d 1005 (2019). We also will not reweigh conflicting evidence or determinations of witness credibility. *Bale v. Allison*, 173 Wn. App. 435, 458, 294 P.3d 789 (2013).

We review whether the trial court's findings support its legal conclusions de novo. *Alexandria*, 28 Wn. App. 2d at 961. To the extent that any of the trial court's "findings of fact"

are conclusions of law that were mislabeled, we treat them as conclusions of law and review them de novo. *Miles v. Miles*, 128 Wn. App. 64, 70, 114 P.3d 671 (2005).

II.  LAW OF THE CASE

A trial court is generally required on a remand to follow any legal mandates or holdings from the appellate court, as those holdings are "the law of the case." *State v. Schwab*, 163 Wn.2d 664, 672, 185 P.3d 1151 (2008).  The law of the case doctrine emphasizes " 'the binding effect of determinations' " and "serves to 'promote[] the finality and efficiency of the judicial process by protecting against the agitation of settled issues.' "  *State v. Harrison*, 148 Wn.2d 550, 562, 61 P.3d 1104 (2003) (alteration in original) (internal quotation marks omitted) (quoting *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992) and *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988)).

Relevant here, our decision in *Sumner Plains I* interpreted the terms of the settlement agreement and determined that, on the record existing at that time, genuine issues of material fact had existed as to whether Wakefield had breached the agreement.  Slip op. at 8, 13.  On remand, the trial court was charged with applying our interpretation of the agreement and determining whether Wakefield met his obligations based on the evidence presented at trial.  *See Schwab*, 163 Wn.2d at 672.

Sumner argues that although the trial court recognized our holding in *Sumner Plains I*, it ignored important aspects of the opinion—thereby "allow[ing] Wakefield to relitigate issues that this [c]ourt conclusively resolved against him." Br. of Appellant at 38.  In addition to arguments about specific findings (discussed below), Sumner appears to make the general argument that the trial court placed too little responsibility on Wakefield for any oversights by the City.  Sumner

appears to suggest that Wakefield was required to not only tell the City about each one of his alterations, but also to personally ensure that the City physically inspected each one of those alterations. In fact, Sumner appears to tie Wakefield's duty "to ensure" all of his alterations were inspected by the City to a duty to actually open up the walls to physically show Kelley the pipes, electrical wiring, and wooden framing—even if Kelley did not deem doing so necessary.

While Sumner acknowledges that *Sumner Plains I* held that Wakefield was not a "guarantor that his alterations—and any required repairs—would comply with the building code," Sumner also appears to somewhat suggest that Wakefield had a duty to ensure that his alterations met the requirements of the City's building code. Br. of Appellant at 27. Sumner contends that this is supported by both *Sumner Plains I* and public policy in accordance with *Taylor v. Stevens County*, 111 Wn.2d 159, 168, 759 P.2d 447 (1988).

In *Taylor*, our Supreme Court addressed whether buyers of a home could bring suit against county building inspectors for negligence in administering the building code because even though the inspectors had previously inspected and permitted the home before sale, the home was later found to contain numerous building code violations. 111 Wn.2d at 161-62. The court held that the county building inspectors could not be held liable because "[t]he duty to ensure that buildings comply with county and municipal building codes rests with individual builders, developers and permit applicants, not local government." *Id.* *Taylor* explained that "building codes are designed to protect the public safety, health and welfare, not to protect individuals from economic loss caused by public officials while carrying on public duties." *Id.* at 169.

Sumner cites *Taylor* extensively in their reply brief to suggest that Wakefield's duties included ensuring that the premises complied with building codes.

Under the agreement, the parties intended that Wakefield's alterations would comply with all applicable codes. To achieve that intent, the agreement required Wakefield to obtain code-compliance inspection and approval from the City of every alteration he made to Sumner's property. . . .

Wakefield breached this obligation. But he did much worse—he evaded the bargain's very spirit. Through the agreement, Sumner sought to eliminate its potential liability for Wakefield's uninspected, unapproved alterations. *To accomplish that intent, Wakefield was required to secure code compliance by the City for all his alterations to Sumner's property.*

. . . By making Sumner the permit applicant, Wakefield attempted to impose on Sumner the duty to ensure that all his alterations complied with code—contrary to *Taylor* and the bargain Sumner struck with him.

Reply Br. of Appellant at 1-2 (emphasis added) (citations omitted).

Sumner misunderstands *Sumner Plains I*. *Sumner Plains I* can be distilled into two basic principles. First, Wakefield was required to "ensure" that the City (here, Kelley) was specifically aware of each one of his alterations. *Sumner Plains I*, slip op. at 13. Second, once the City was aware of the alterations, Wakefield was required to follow the City's instructions for repair in order to receive the City's approval. *Id.* at 11-12. That was all that was required of Wakefield—it would not be a breach by Wakefield if the City missed something or approved an alteration that was not in fact up to code. *Id.* In fact, we said directly that "[t]here are no terms in the agreement that required the repairs to be up to code, and there is no term that could be reasonably interpreted as requiring Wakefield to ensure the repairs were up to code. *Id.* at 11.

The trial court followed these basic principles, at least in broad strokes. Although the trial court did not use the word "ensure" in its ruling, it made it clear that Wakefield had an obligation to make the City aware of all of his alterations in order to inspect them. If Sumner's position is that Wakefield had "responsibility" for a lack of code compliance or for any oversights by the City following Wakefield making full disclosure of his alterations, we disagree. Such a responsibility,

25

including the allocation of any potential risk presented by *Taylor*, could have been negotiated by the parties and inserted into the settlement agreement. As stated by the trial court in its oral ruling, "[Sumner] could have required approval of a contractor or a subs list in the agreement. . . . [or] required code compliance. [They] did not." 1 VRP (Oct. 5, 2023) at 10. To impose the personal responsibility for code compliance on Wakefield now would be an expansion of the terms of the settlement agreement as interpreted by *Sumner Plains I*.

III. ANALYSIS OF THE TRIAL COURT'S FACTUAL FINDINGS (AND CONCLUSIONS OF LAW)

Beyond the general argument that the trial court failed to abide by *Sumner Plains I*, Sumner also contends that the trial court relied on numerous factual findings that were unsupported by substantial evidence, which invalidate the overall conclusion of law that Wakefield complied with the settlement agreement. Notwithstanding our determination that Sumner generally misinterpreted *Sumner Plains I*, we agree that the trial court erred, in part, in addressing specific alterations.[5]

A. FRAMING ALTERATIONS FOR RESTORATION OF THE DEMISING WALL

Sumner argues that the trial court erred because Wakefield failed to ensure that the City inspected his alterations that restored the demising wall, which were hidden behind the drywall, such as the wall's internal framing. Likely rooted in their general misunderstanding of *Sumner Plains I*, Sumner appears to argue that Wakefield breached the settlement agreement because he

---

[5] We analyze Sumner's complaints about the trial court's findings and conclusions using some of the same categories as above: (1) Wakefield's restoration of the framing of the demising wall, (2) Wakefield's alterations to the plumbing, (3) Wakefield's alterations to the electrical and wiring, and (4) Wakefield's good faith efforts to comply with the settlement agreement.

26

failed to ensure that Kelley looked behind the drywall to inspect *all* of the alterations. We disagree that the trial court erred regarding the demising wall.

For this argument, Sumner challenges a portion of the trial court's broad finding 19 as it relates to Wakefield's duty to have the City inspect and approve his alterations to the framing of the wall. Finding 19 states simply:

> City of Sumner Building Official Kelley conducted an initial on-site inspection of Wakefield's tenant improvements in August 2019. . . .

CP at 848. Sumner argues that this portion of finding 19, is unsupported by substantial evidence because "the City did not inspect all of Wakefield's alterations—only what Kelley could visibly see, necessarily excluding Wakefield's . . . framing alterations."[6] Br. of Appellant at 58.

The root of Sumner's complaint about finding 19 is grounded in its misunderstanding of the settlement agreement. Wakefield was obligated to ensure that the City (Kelley) was aware of, and inspect, all of his alterations. But this duty does not include the further duty to instruct the City on how to carry out its inspection. If the City, through Kelley, determined that the drywall did not need to be opened up for his direct view, that was Kelley's prerogative, not a breach by Wakefield.

With the settlement agreement properly viewed, substantial evidence supports finding 19 and the other findings related to the restoration of the demising wall that had previously served as a pass-through. Indeed, unchallenged by Sumner are the remaining portions of finding 19 that

---

[6] Sumner also challenges a separate portion of finding 19 and a similar portion of finding 14, which state that Wakefield "was open and forthright" and that Wakefield did not "hide" or "conceal" any of his alterations or work from Kelley. Br. of Appellant at 58. To the extent these assignments of error are focused on whether Wakefield was honest, we reject them. As discussed below, we view these challenges as attacks on the trial court's credibility findings, which we do not second-guess. *See Bale*, 173 Wn. App. at 458.

explain that Wakefield told Kelley about the wall and that Kelley, not Wakefield, decided to inspect the wall without opening it up:

> At the initial on-site inspection, Wakefield told Kelley about his improvements, including the fact that in constructing the pass-through repair, Wakefield had used wood rather than metal studs. Wakefield provided Kelley with a ladder so he could inspect the office ceiling framing and insulation from above. . . . Wakefield afforded Kelley a full opportunity to inspect any and all portions of the tenant improvements. Kelley testified that he was aware that Wakefield had used wood studs in filling in the demising wall.

CP at 848 (FF 19). Because these remaining portions of finding 19 are unchallenged, they are verities on appeal. *Alexandria*, 28 Wn. App. 2d at 961. These portions, together with the testimony that supported it, are sufficient to support the trial court's decision that the City inspected Wakefield's framing of the restored demising wall within the meaning of the settlement agreement.

Simply put, Wakefield complied with his duty to tell Kelley that he reframed the wall and used wood studs to restore the demising wall. *Sumner Plains I*, slip op. at 10 n.4, 12-13. It was then up to Kelley to decide whether further inspection of the framing was necessary. *Id.* at 11-12. Thus, the trial court's finding that Wakefield did not breach the agreement with respect to his reframing of the demising wall was supported by substantial evidence.

B. PLUMBING ALTERATIONS

Sumner next challenges the trial court's finding that Wakefield fulfilled his obligations with respect to the plumbing alterations. Sumner argues that several of the trial court's factual findings related to Wakefield's plumbing alterations are unsupported by the evidence. We agree.

For this argument about the plumbing, Sumner challenges two findings that are very broad, findings 19 and 42. Finding 19 reads, "City of Sumner Building Official Kelley conducted an initial on-site inspection of Wakefield's tenant improvements in August 2019," and finding 42

reads, "Kelley signed off on a job site inspection card, finalizing the validity of the permit for Wakefield's tenant improvements on May 19, 2020." CP at 848, 852. Sumner argues that because Kelley testified that he was not aware of these plumbing alterations, it would have been impossible for him to have inspected or approved "Wakefield's tenant improvements" in the initial or final inspections. Br. of Appellant at 58, 62.

Sumner is correct that Kelley's inspections did not include Wakefield's plumbing alterations. Wakefield never mentioned the plumbing alterations to Kelley, so there is no way they could have been inspected or approved. And Kelley signed off on an inspection that included only "framing," "insulation," and "final building"—not plumbing work. Ex. 119; CP at 852 (FF 42). Yet Wakefield offers no viable argument that anyone else was responsible for the plumbing alterations, only that he did not remember them. Wakefield simply said "that was nine years ago." 4 VRP at 448. Even in the light most favorable to Wakefield, substantial evidence does not support the trial court's findings 19 and 42 that Kelley inspected all of Wakefield's "tenant improvements."

Because Wakefield failed to tell Kelley about the plumbing alterations, which precluded Kelley from inspecting the plumbing, the trial court's finding that Wakefield did not breach the settlement agreement on this aspect was not supported by substantial evidence. The settlement agreement contains no exception allowing forgetfulness to negate Wakefield's duty "to ensure" that the City was aware of all of his alterations.[7] Moreover, the trial court's conclusions of law

---

[7] Sumner also challenges the trial court's findings that Wakefield was not "aware" of the plumbing alterations. CP at 848 (FF 23); Br of Appellant at 59-60. While somewhat ambiguous, if the trial court intended to mean that Wakefield did not *remember* the plumbing alterations at the time of Kelley's inspection, such a finding is immaterial to breach, given our conclusion that the settlement agreement plainly required Wakefield's disclosure of all of his alterations without exceptions. Thus, we do not further address it.

were silent as to these plumbing alterations. Thus, without the support of substantial evidence, the trial court erred in deciding that Wakefield did not breach the terms of the settlement agreement with respect to the plumbing alterations.

## C. ELECTRICAL ALTERATIONS

The final substantive area of Sumner's challenges pertains to the electrical alterations. Sumner contends that the trial court erred because Wakefield failed to disclose to Kelley that he had made any electrical alterations to Sumner's property.

The trial court found that Kelley had been aware of the electrical alterations, stating in finding 20,

> It was clear to Kelley that Wakefield's tenant improvements included electrical installations by the apparent outlets and can lights in the office. Kelley testified that he was aware that Wakefield's tenant improvements had included electrical work.

CP at 848.

Sumner contends that this finding is not supported by substantial evidence because Wakefield failed to explain to Kelley that the electrical work was unpermitted. According to Sumner, this omission was a breach of Wakefield's duty to ensure that the City fully inspected his alterations. We agree.

Even construing the testimony in favor of Wakefield, as the party who prevailed below, substantial evidence does not support the conclusion that Wakefield fully disclosed the nature of the electrical alterations. *See Sumner Plains I*, slip op. at 13. Although Wakefield testified that he had shown Kelley the electrical alterations during Kelley's initial inspection and that he had told Kelley generally that he did all the alterations, neither he nor Kelley could remember at trial whether Wakefield had specifically told Kelley that he had personally installed the electrical

alterations or that they were unpermitted. And Kelley testified that if Wakefield had disclosed this that he would have told Wakefield to get an additional inspection from L & I. Accordingly, there is no substantial evidence that Wakefield made Kelley aware that he personally did his electrical alterations.

Here, Wakefield fell short of what the settlement agreement required. The settlement agreement represented a bargain between the parties. Wakefield was entitled to rely on the advice and expertise of the City, even if that meant the final repairs did not meet the building codes. *See Sumner Plains I*, slip op. at 11-12. But in exchange, a cornerstone of the settlement agreement was that Wakefield was obliged to make the City fully aware of his alterations. In other words, even if Wakefield was not obligated to know that his electrical alterations would need to be approved by a separate government agency, he was obligated to ensure that Kelley knew the nature of his electrical alterations, including that they were unpermitted. Given the mutual expectations underlying the settlement agreement, it was not enough for Wakefield to have shown Kelley the lighting and switches and to broadly have told Kelley that he had done "everything" in the added office space, without further explanation. By not clearly giving Kelley complete information about his electrical alterations, "it [was] impossible for the [C]ity to approve those alterations." *Id.* at 13.[8]

___

[8] Sumner also challenges the trial court's finding 22 that said that Wakefield would have obtained an independent inspection from L & I if Kelley had told him to. Sumner argues that this is contrary to the fact that in June 2020, after the commencement of this litigation, Kelley told Wakefield to get approval from L & I. Even assuming this finding is incorrect, it is immaterial considering our decision that Wakefield failed to fully disclose the nature of the electrical alterations.

Thus, substantial evidence does not support the trial court's conclusion of law 17 that the City "was aware of Wakefield's electrical wiring work which was included in the build-out area" or the trial court's decision that Wakefield did not breach the settlement agreement with respect to his electrical alterations. CP at 856.

D. GOOD FAITH AND FAIR DEALING

Finally Sumner challenge the trial court's decision that Wakefield did not breach the duty of good faith and fair dealing. We disagree that the trial court erred on this issue.

Every contract includes an implied duty of good faith and fair dealing. *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 112, 323 P.3d 1036 (2014). The duty of good faith "requires only that the parties perform in good faith the obligations imposed by their agreement." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). "The duty of good faith requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Edmonson v. Popchoi*, 172 Wn.2d 272, 280, 256 P.3d 1223 (2011) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (Am. Law Inst. 1981)). Bad faith includes, "evasion of the spirit of the bargain, lack of diligence and slacking off . . . and interference with or failure to cooperate in the other party's performance." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (Am. Law Inst. 1979).

Here, Sumner argues that Wakefield intentionally made misrepresentations to the City and did not communicate with Sumner. Sumner also argues that Wakefield breached this duty by misleading the City about the scope of his alterations, causing a smaller inspection.

To make this bad faith argument, Sumner points to specific trial court findings. First Sumner challenges the trial court's findings that Wakefield's decision to sign the permit

application under the section labeled "Signature of Owner/ Authorized Agent" was a good faith mistake.[9]  Second, Sumner challenges the trial court's findings that throughout the permitting process, and during both the initial and final inspections, Wakefield was willing to comply with Kelley's direction and act "in good-faith," was "open and forthright," and did not "conceal" or "hide," any facts or details related to his alterations or work or "otherwise try to mislead Kelley." CP at 847 (FF 14), 848 (FF 19, 22), 851-52 (FF 41), 852 (FF 45).  Sumner contends that these findings are not supported by substantial evidence because Wakefield did not disclose to Kelley the full extent of his framing, plumbing and electrical alterations.  They further argue that some of them, including finding 14, are actually legal conclusions that are contrary to *Sumner Plains I*.

Notwithstanding Sumner's attempt to characterize these findings about good faith and fair dealing as appropriate for our review, each are grounded in credibility determinations about Wakefield.  Wakefield's testimony suggested he was continuously making honest attempts to comply with the terms of the settlement agreement.  Before drawing any conclusions about Wakefield's good faith, the trial court would necessarily have needed to determine whether this testimony was credible—and it did.  The trial court clearly believed Wakefield, expressly finding that "Wakefield's testimony about his compliance efforts was credible" and determining that he

---

[9] Relatedly, Sumner also challenges the trial court's finding that Wakefield's mistaken signature was immaterial.  Sumner argues that if the City had known, it would have rejected Wakefield's application.  Further, Sumner argues that it was material because it caused the City to only communicate with Wakefield, thereby "cutting Sumner out of the process."  Br. of Appellant at 61.  We disagree that Wakefield's signature as Sumner's authorized agent impacts the trial court's overall conclusions of law.  *See Coleman*, 6 Wn. App. 2d at 516.  The signature did not have any relationship to scope of any inspection or whether Wakefield accomplished all necessary repairs— it only would have affected whether Kelley "would[] [have] been able to *process* th[e] permit." 4 VRP at 375, 401-02.

did not intend to exclude Sumner from the permit application process. CP at 853 (FF 48). Also necessarily supporting the trial court's findings about Wakefield's good faith is its finding that Sumner's claim that "Wakefield concealed his actions from Sumner[] and intentionally excluded [them]" was "not [] credible." CP at 852-53 (FF 47).[10] These credibility findings are squarely within the trial court's role as the fact finder and outside the scope of our review. *Bale*, 173 Wn. App. at 458. Indeed, the trial court's repeated description of Wakefield as being "open," "forthright," and "honest," are not so much findings we can review as they are alternative labels for a finding that Wakefield was credible. Once we leave these credibility findings undisturbed, as we must, there is sufficient evidence to support the trial court's conclusion that Wakefield did not breach the implied duty of good faith and fair dealing.[11]

IV. ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. The settlement agreement provides that in any enforcement litigation the substantially prevailing party is entitled to reasonable attorney fees and costs. Ex. 2. Under RCW 4.84.330, such a provision makes an award of attorney fees mandatory. However, "[i]f both parties prevail on major issues, it is appropriate to let each bear

---

[10] Although Sumner repeatedly cites to Wakefield's signature on the permit application to support its contentions of bad faith, Sumner does not challenge the trial court's finding 29 that "[t]o the extent Wakefield's signature . . . constituted a 'misrepresentation' to the City . . ., the misrepresentation was not intentional." CP at 850 (FF 29). Thus, it is a verity on appeal that Wakefield's signature was not an intentional misrepresentation. *Alexandria*, 28 Wn. App. 2d at 961.

[11] Sumner also challenges multiple findings or parts of findings (FFs 16, 26, 27, 47) that are either insufficiently argued, tied to findings discussed above, or immaterial to the trial court's legal conclusions, so we do not further address them.

their own costs and fees." *Transpac Dev., Inc. v. Oh,* 132 Wn. App. 212, 217, 130 P.3d 892 (2006).

Here, because neither party wholly prevailed, we do not award attorney fees.[12]

CONCLUSION

The trial court erred in concluding that Wakefield fulfilled some of his obligations under the settlement agreement. Although the trial court correctly concluded that Wakefield had acted in good faith and had disclosed his alterations that he had made to restore the demising wall, Wakefield breached the settlement agreement when he failed to fully disclose his plumbing and electrical alterations. Accordingly, we affirm in part and reverse in part. With this decision we also reverse the trial court's attorney fee award to Wakefield.

As a remedy, Sumner argues that they are entitled to an "undisputed amount" in damages. Br. of Appellant at 68. Wakefield responds that he is not liable for any of the expenses listed by Sumner because none of them were necessary for the approval Wakefield obtained from the City. Wakefield also appears to contest the accuracy of some of Sumner's calculation of damages.

When reversing a trial court's decision that found no breach of contract, we generally remand to the trial court to calculate and enter findings as to the damages resulting from the breach. *See*, *e.g.*, *Aquarian Found. v. KTVW, Inc.*, 11 Wn. App. 476, 480, 523 P.2d 969 (1974) (remanding to the trial court to enter additional findings regarding damages after reversing the trial court's decision that there had been mutual mistake and that there was no breach.). Here, because we have

---

[12] Sumner makes the additional argument that this case should be remanded to a different superior court judge than decided the bench trial. Based on our review of the record, we find this unwarranted and deny the request.

No. 59069-7-II

reversed only in part, we remand to the trial court to determine the appropriate damages consistent with our decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

LEE, J.